UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:13-cv-129-RJC

| | |
|---|---|
| GUY T. PENDERGRASS, )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>NORTH CAROLINA DEPARTMENT )<br>OF PUBLIC SAFETY, et al., )<br>)<br>)<br>Defendants. )<br>_____ ) | **ORDER** |

**THIS MATTER** is before the Court on a Motion to Dismiss for Failure to State a Claim by Defendants Ken Beaver, FNU Bradley, FNU Cranford, and FNU Rushing, (Doc. No. 42). Also pending before the Court is Plaintiff's Motion for Petition for Contempt of Court Citation, (Doc. No. 41), and Plaintiff's Motion for Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, (Doc. No. 56).

**I.     BACKGROUND**

Pro se Plaintiff Guy Pendergrass, a state court inmate currently incarcerated at Albemarle Correctional Institution in Badin, North Carolina, filed this action on February 26, 2013, and he filed a First Amended Complaint on September 9, 2014. Plaintiff's allegations arise out of events that occurred while Plaintiff was incarcerated at Lanesboro Correctional Institution. Plaintiff has named as Defendants the North Carolina Department of Public Safety; Ken Beaver, identified as the Assistant Superintendent of Lanesboro; and seven nurses at Lanesboro, identified as FNU Walrath, FNU Medlin, FNU Rushing, FNU Bradley, FNU Cranford, FNU

Rizaldi, and FNU Cross.[1] In the First Amended Complaint, Plaintiff describes himself as a "57-year-old brittle diabetic," and he alleges that Defendants were deliberately indifferent to Plaintiff's serious medical need arising from a blister on his toe, which resulted in the amputation of his toe in November 2012.

On May 15, 2014, Defendants Bradley and Rushing filed a motion to dismiss the original Complaint. (Doc. No. 23). On June 18, 2014, before the Court adjudicated the motion to dismiss, Plaintiff moved to amend his complaint. (Doc. No. 30). On September 9, 2014, the Court granted Plaintiff's motion to amend his complaint. The Court also ordered summonses to be reissued to those Defendants who had not been served. (Doc. Nos. 35; 37). On October 8, 2014, Defendants Beaver, Bradley, Cranford, and Rushing filed a motion to dismiss the First Amended Complaint based on failure to state a claim under Rule 12(b)(6) of the Federal Rules of Civil Procedure. On October 9, 2014, the Court entered an order granting Plaintiff fourteen days in which to file a response to the motion to dismiss. (Doc. No. 44). On November 4, 2014, Plaintiff filed a response to the motion to dismiss. (Doc. No. 48). On December 10, 2014, summonses were returned as unexecuted as to Defendants Walrath, Medlin, Rizaldi, and Cross. (Doc. Nos. 52; 53; 54; 55)

The following allegations in the First Amended Complaint are taken as true for the purposes of the pending motion to dismiss:

According to Plaintiff, he is a 57-year-old "brittle" diabetic and requires medical attention such as glucose readings and insulin injections on a daily basis. (Doc. No. 36 at 3). Plaintiff alleges that he noticed a blister on his left big toe on or about August 21, 2012, and he

---

[1] In the original Complaint, Plaintiff named the following persons as Defendants: Dr. Sami Hassan, and nurses Medlin, Tarrantina, Cranford, Rizaldi, Rushing, Bradley, Shope, and Martinez.

submitted a sick call request to an unidentified correctional officer on August 22, 2012, regarding his diabetic snack bag and his orthopedic shoes, which he alleges caused the blister. (Id. at 3-4). That same day, Plaintiff noticed that his blister had "burst open." (Id. at 4). Plaintiff alleges that the next day, August 23, 2012, he told Nurse Medlin about the blister during his annual exam. (Id.). Plaintiff alleges that he also explained to Nurse Medlin that he had submitted a sick call request on August 22, 2012, before the blister burst. (Id.). Plaintiff alleges that Nurse Medlin replied, "We are a little short on staff, so we are a little behind on sick calls right now, just be patient and we will get to you as soon as we can." (Id.). Plaintiff alleges that he explained again that he needed for someone to treat the blister before it got infected, to which Medlin replied that she understood what Plaintiff saying but that, again, they would get to Plaintiff as soon as they could. See (Id. at 5-6). Plaintiff also alleges that he had a previous blister on his hand while incarcerated at Maury Correctional Institution, which was handled according to the "proper" protocol, which meant that Plaintiff had been immediately placed in a quarantine room and given antibiotics for ten days. (Id. at 5). Plaintiff alleges that if this same protocol "had been followed in the case of Plaintiff's toe, Plaintiff believes that he would not have had his toe amputated." (Id.).

According to Plaintiff, on August 26, 2012, his leg was swollen and he declared a medical emergency. (Id. at 6). After declaring the medical emergency, Plaintiff was taken to "main medical," where he was seen by Nurse Tarrantina, who asked Plaintiff why he had not reported the blister before then. (Id.). Plaintiff explained to Tarrantina that he had reported the burst blister and Tarrantina, in turn, reported to the on-call physician, who ordered antibiotics and compresses for Plaintiff and a follow-up appointment. (Id.). On August 27, 2012, Plaintiff was seen by his primary care provider Dr. Hassan, who made a Utilization Review ("UR")

authorization request for Plaintiff to have an "emergency podiatry consult." (Id.).

On August 30, 2012, Plaintiff was taken to Central Prison to see a podiatrist, Dr. Fitzhugh, who explained to Plaintiff that his infection had spread to "the tip of Plaintiff's toe bone." (Id. at 7). Dr. Fitzhugh then removed the infected area of bone and tissue to prevent further infection and stitched up Plaintiff's toe. (Id.). On September 6, 2012, Plaintiff again saw Dr. Fitzhugh, who ordered Lanesboro medical staff not to change Plaintiff's dressing on his toe unless it got wet in the shower. (Id.). On September 13, 2012, Plaintiff had another follow-up appointment at Central Prison with x-rays taken. (Id.). On October 4, 2012, Plaintiff again visited Dr. Fitzhugh, who removed the stitches and informed Plaintiff that the infection on his toe had spread and required amputation of the "toe to below the toe's first joint." (Id. at 8). On October 11, 2012, Plaintiff was again seen by Dr. Fitzhugh. (Id.).

On October 24, 2012, Plaintiff was seen at Central Prison by Dr. Labore, who removed stitches from Plaintiff's toe and ordered x-rays, antibiotics, and daily dressing changes. (Id.). According to Plaintiff, thereafter, between October 26, 2012, and November 17, 2012, Plaintiff's dressings were changed daily by Defendant nurses Bradley, Rushing, Cranford, Rizaldi, and Cross. (Id.). Plaintiff informed the various nurses that his toe was turning "greyish-white" and they reassured him that he would be seen at the podiatry clinic and that there would be new skin beneath the dead skin. (Id. at 9). On November 7, 2012, Plaintiff was examined by Nurse Shope, who asked Plaintiff why he had not mentioned the infection to staff earlier. (Id.). Plaintiff told Shope what the other nurses had told him about new skin growing beneath the dead skin. (Id.). Shope told Plaintiff the other nurses were "wrong," that his toe was infected, and that he was likely "going to lose the remainder of his toe if not part of his foot." (Id.). Nurse Shope then squirted Plaintiff's toe with betadine and exposed the bone. (Id. at 9-10). Plaintiff

alleges that Nurse Shope immediately reported the occurrence to Dr. Hassan, who ordered that Plaintiff be transported to the emergency room at Carolina's Medical Center in Monroe, North Carolina. (Id. at 10).

At the local emergency room, Plaintiff alleges that Dr. Farah ordered blood tests, cultures, x-rays, intravenous antibiotics, and pain medications. (Id.). Dr. Farah told Plaintiff he could not treat his toe based on liability issues and that he could only treat the symptoms. (Id.). On November 8, 2012, Plaintiff was taken back to the podiatry clinic at Central Prison. (Id. at 10-11). Dr. Labore refused to treat Plaintiff's toe based on liability issues, but prescribed antibiotics and submitted a UR request for surgery on Plaintiff's toe. (Id. at 11). Each day from November 11, 2012, to November 14, 2012, nurses change the dressing on Plaintiff's toe. (Id. at 11-12). On November 11, 2012, Defendant Rushing was changing Plaintiff's dressing when he noticed that the remainder of the skin that covered the toe bone had stuck to the gauze dressing, totally exposing Plaintiff's toe bone. (Id. at 11). On November 12 and 13, nurses Rizaldi and Martinez changed Plaintiff's dressing. (Id.). On November 14, 2012, while nurse Martinez was changing Plaintiff's dressing, nurse Rizaldi informed Plaintiff that the emergency request that Dr. Labore submitted to the medical utilization review board on November 8, 2012, was approved on November 9, 2012, for general surgery to close the toe wound. (Id. at 11-12).

On November 15, 2012, Plaintiff was taken to Central Prison's medical center, where Dr. Stewart surgically removed the remainder of Plaintiff's toe. (Id. at 12). Following Plaintiff's surgery, Stewart prescribed antibiotics and pain medication and ordered that Plaintiff's dressing be changed every other day. (Id.). From November 16, 2012, through December 21, 2012, nurses Eaves, Bradley, Rushing, Rizaldi, and Hernandez changed Plaintiff's dressing every other day. (Id.). On December 13, 2012, Dr. Fitzhugh removed the stitches from Plaintiff's foot.

(Id.).

## II. STANDARD OF REVIEW

On a motion to dismiss for failure to state a claim, the Court must accept the factual allegations of the claim as true and construe them in the light most favorable to the non-moving party. Coleman v. Maryland Ct. of Appeals, 626 F.3d 187, 189 (4th Cir. 2010). To survive the motion, the "complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)). To be "plausible on its face," a plaintiff must demonstrate more than "a sheer possibility that a defendant has acted unlawfully." Id. A plaintiff therefore must "articulate facts, when accepted as true, that 'show' that the plaintiff has stated a claim entitling [it] to relief, i.e., the 'plausibility of entitlement to relief.'" Francis v. Giacomelli, 588 F.3d 186, 193 (4th Cir. 2009) (quoting Iqbal, 556 U.S. 662 at 678).

## III. DISCUSSION

Plaintiff purports to bring a claim against the moving Defendants of an Eighth Amendment violation based on deliberate indifference to a serious medical need. A prison official's deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment. Estelle v. Gamble, 429 U.S. 97, 104 (1976). A deliberate indifference claim consists of two components, objective and subjective. Objectively, the inmate's medical condition must be "serious"—"one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." Iko v. Shreve, 535 F.3d 225, 241 (4th Cir. 2008). An official is deliberately indifferent to an inmate's serious medical needs only when the official subjectively "knows of and disregards an excessive risk to inmate health or safety."

Farmer v. Brennan, 511 U.S. 825, 837 (1994).  This is a higher standard for culpability than mere negligence or even civil recklessness; thus, many acts or omissions that would constitute medical malpractice will not rise to the level of deliberate indifference.  See Estelle, 429 U.S. at 106.  To show an Eighth Amendment violation, it "is not enough that an official should have known of a risk; [the official] must have had actual subjective knowledge of both the inmate's serious medical condition and the excessive risk posed by the official's action or inaction." Jackson v. Lightsey, 775 F.3d 170, 178 (4th Cir. 2014) (emphasis in original) (citing Farmer, 511 U.S. at 837-39, and Iko, 535 F.3d at 241).

 The Court will grant Defendants' motion to dismiss.  First, as to Defendant North Carolina Department of Public Safety, the Department is an arm of the State of North Carolina for Eleventh Amendment purposes and, thus, enjoys sovereign immunity from suit as to Plaintiff's claim for money damages.  See Will v. Dep't of State Police, 491 U.S. 58, 66 (1989). Next, as to moving Defendant Ken Beaver, Plaintiff's allegations against Beaver do not give rise to an Eighth Amendment claim because they relate solely to how Beaver responded to Plaintiff's administrative grievances.  See e.g., Akbar v. Kornegay, No. 5:12-CT-3233-FL, 2014 WL 3734692, at *3 (E.D.N.C. July 28, 2014) (holding that "a ruling adverse to a plaintiff on an administrative complaint does not give rise to a constitutional claim").  Thus, Defendant Beaver is entitled to be dismissed.
Next, as to Defendants Bradley, Rushing, and Cranford, dismissal is appropriate as to all three of these Defendants because Plaintiff alleges, at most, that these Defendants were negligent in their treatment of Plaintiff's toe.  As noted, a claim of an Eighth Amendment violation requires more than merely negligent conduct or medical malpractice.  Rather, to state a claim of an Eighth Amendment violation, the defendants must know about the serious risk of harm to the plaintiff,

and the defendant must be acting with deliberate indifference to that risk. Here, by Plaintiff's own allegations, these three Defendants were not even aware of the serious risk of harm to Plaintiff—that is, that Plaintiff's toe infection could lead to the amputation of Plaintiff's toe. Plaintiff specifically alleges as to all three of these Defendants that they "are trained nurses and should be able to recognize an infection. The Defendants <u>failed to do so</u> in this instance." See (Doc. No. 36 at 20; 21; 22). By Plaintiff's own allegations, then, these three Defendant nurses did not know how serious Plaintiff's infection was. It follows that if they were not aware of a serious risk of harm to Plaintiff, then they could not have been deliberately indifferent to that harm. In sum, at most, Plaintiff has alleged that the moving Defendant nurses Bradley, Cranford, and Rushing were negligent in their failure to discern that Plaintiff's infection was bad enough that he was in serious risk of losing his toe. This is simply not enough to state a claim for an Eighth Amendment violation. Indeed, despite the unfortunate consequence of Plaintiff ultimately losing his toe following an infection, the allegations in this action are those of a garden-variety medical malpractice lawsuit. Accord <u>Jackson</u>, 775 F.3d at 178-79 ("While a [medical provider's] erroneous diagnosis of a serious heart condition . . . may well represent a deviation from the accepted standard of care, standing alone it is insufficient to clear the 'high bar' of a constitutional claim.") (quoting <u>Iko</u>, 535 F.3d at 241).

The Court notes that, as to all remaining Defendants in this action (Defendants FNU Cross, FNU Medlin, FNU Rizaldi, and FNU Walrath), the summonses were returned to this Court as unexecuted on December 10, 2014. (Doc. Nos. 52; 53; 54; 55). Plaintiff has not taken any action since then to have these Defendants served with process. In any event, dismissal as to these remaining Defendants is also appropriate. See <u>Silverton v. Dep't of Treasury</u>, 644 F.2d 1341, 1345 (9th Cir. 1981) (holding that, where the court grants a motion to dismiss as to one

defendant, the court may dismiss claims against non-moving defendants "in a position similar to that of moving defendants"). First, as to Defendant nurses Rizaldi and Cross, Plaintiff's allegations against them mirror those against the moving Defendants; thus, the action against Defendant nurses Rizaldi and Cross is subject to dismissal for the same reasons the action is being dismissed as to the moving Defendant nurses. As to these two nurses, Plaintiff alleges that they "are trained nurses and should be able to recognize an infection," but that they "failed to do so in this instance." (Doc. No. 36 at 22). In sum, Plaintiff has simply not alleged more than ordinary negligence in nurses Rizaldi's and Cross's failure to discern the seriousness of Plaintiff's medical condition.

Next, as to Defendant Medlin, Plaintiff alleges, at most, that nurse Medlin performed a blood test on Plaintiff on August 23, 2012, when Plaintiff told her that he was a brittle diabetic and that the blister on the tip of his left toe had burst. Plaintiff explained that he had submitted a sick call request about the blister before it burst and that Nurse Medlin replied, "We are a little short on staff, so we are a little behind on sick calls right now, just be patient and we will get to you as soon as we can." (Doc. No. 36 at 4). Plaintiff alleges that he explained again that he needed for someone to treat the blister before it got infected, to which Medlin replied that she understood what Plaintiff saying but that, again, they would get to Plaintiff as soon as they could. See (Doc. No. 36 at 5-6).

Like his allegations against the other Defendant nurses, Plaintiff's allegations against Defendant Medlin are not enough to state a claim for deliberate indifference to serious medical needs. Plaintiff does not allege that Medlin knew that Plaintiff had a serious medical need when she examined the broken blister on Plaintiff's toe on August 23, 2012, or that she was deliberately indifferent to such need. Moreover, despite that Medlin told Plaintiff he would have

to wait to be seen, by Plaintiff's own allegations he was, in fact, examined three days later on August 26, 2012, following his declaration of a medical emergency because his left leg had become swollen. (Id. at 6). In sum, Defendant Medlin is also subject to dismissal.

Finally, as to Defendant Walrath, Plaintiff alleges that Walrath was the Nurse Administrator at Lanesboro at all relevant times. The only allegations in the Complaint as to Walrath relate to how Walrath responded to Defendant's grievances. As with Defendant Beaver, Plaintiff's allegations that Defendant Walrath's responses to Plaintiff's grievances were inadequate are not enough to give rise to an Eighth Amendment claim. Moreover, to the extent that Plaintiff is attempting to bring claims against Defendant Walrath based merely on Walrath's position as a supervisor, it is well settled that in Section 1983 actions, liability may not be based on respondeat superior. See Monell v. Dep't of Soc. Servcs., 436 U.S. 658, 694 (1978).

Next, in support of his "Petition for Contempt of Court Citation," Plaintiff states that he requests for this Court to issue a contempt of court citation against Defendants and against their counsel with the North Carolina Attorney General's office for failing to file an Answer to Plaintiff's First Amended Complaint. Plaintiff's motion is denied, as he has wholly failed to show that Defendants or their counsel are in contempt of any order by this Court.

Finally, in support of his motion for preliminary injunction, Plaintiff requests that this Court order the Defendants to transfer him to Nash Correctional Institution ("Nash CI") in order to provide him access to a facility that is air-conditioned. Plaintiff states that he suffers from type 1 diabetes and is confined a wheelchair. Plaintiff further states that he has been approved for transfer to Nash CI, but that, for reasons unknown to him, he has not been transferred to that facility. Plaintiff further complains that there are not enough fans at his current housing facility Albemarle and that the heat from a lack of air conditioning at Albemarle has an adverse effect on

his health. The Court will deny the motion for preliminary injunction as moot because the Court is dismissing this action on the merits. In any event, the conditions about which Plaintiff complains in his motion for preliminary injunction—the lack of air conditioning—are not related to the claims in this lawsuit. In sum, the Court will deny Plaintiff's motion for preliminary injunction.

## IV. CONCLUSION

For the reasons stated herein, the Court will grant Defendants' motion to dismiss and dismiss Plaintiff's Eighth Amendment claim against all Defendants in this action.

**IT IS, THEREFORE, ORDERED** that:

1. Defendants' Motion to Dismiss, (Doc. No. 42), is **GRANTED**, and this action is dismissed with prejudice.

2. Plaintiff's Motion for Petition for Contempt of Court Citation, (Doc. No. 41), is **DENIED**.

3. Plaintiff's Motion for Order to Show Cause for Preliminary Injunction and Temporary Restraining Order, (Doc. No. 56), is **DENIED**.

4. The Clerk is directed to terminate this action.

Signed: May 19, 2015

Robert J. Conrad, Jr.
United States District Judge